**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

| | 100 EAST FIFTH STREET, ROOM 540 | |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: July 13, 2022

Mr. Charles J Crueger
Mr. Benjamin Aaron Kaplan
Cruger Dickinson
4532 N. Oakland Avenue
Whitefish Bay, WI 53211

Mr. Robert Samuel Gilley
Ms. Jennifer Orr Mitchell
Dinsmore & Shohl
255 E. Fifth Street, Suite 1900
Cincinnati, OH 45202

Mr. Jordan Matthew Lewis
4473 N.E. 11th Avenue
Ft. Lauderdale, FL 33334

Ms. Jaime Santos
Goodwin Procter
1900 N Street, N.W.
Washington, DC 20036

Re:   Case No. 21-3977, *Danielle Forman, et al v. TriHealth, Inc., et al*
      Originating Case No. : 1:19-cv-00613

Dear Counsel,

   The court today announced its decision in the above-styled case.

   Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                              Yours very truly,

                              Deborah S. Hunt, Clerk

                              Cathryn Lovely
                              Deputy Clerk

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0153p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

DANIELLE FORMAN, NICHOLE GEORG, and CINDY HANEY, individually and as representatives of a Class of Participants and Beneficiaries on behalf of TriHealth Inc. Retirement Plan,

> *Plaintiffs-Appellants*,

*v.*

TRIHEALTH, INC. and TRIHEALTH 401(k) RETIREMENT SAVINGS PLAN RETIREMENT COMMITTEE,

> *Defendants-Appellees*.

No. 21-3977

---

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:19-cv-00613—Matthew W. McFarland, District Judge.

Argued: June 29, 2022

Decided and Filed: July 13, 2022

Before: SUTTON, Chief Judge; KETHLEDGE and READLER, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Benjamin Kaplan, CRUEGER DICKINSON LLC, Whitefish Bay, Wisconsin, for Appellants. Jennifer Orr Mitchell, DINSMORE & SHOHL LLP, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Benjamin Kaplan, Charles Crueger, CRUEGER DICKINSON LLC, Whitefish Bay, Wisconsin, Jordan M. Lewis, JORDAN LEWIS P.A., Ft. Lauderdale, Florida, for Appellants. Jennifer Orr Mitchell, R. Samuel Gilley, DINSMORE & SHOHL LLP, Cincinnati, Ohio, for Appellees.

_____

**OPINION**

_____

SUTTON, Chief Judge.   Under ERISA, short for the Employee Retirement Income Security Act of 1974, those who invest other peoples' retirement money must do so "with the care, skill, prudence, and diligence" that a reasonable professional in the area would use.  29 U.S.C. § 1104(a)(1)(B).  At issue in this case are the various ways in which the duty of prudence applies to the investment options that a company offers to its employees for their 401(k) and other defined-contribution plans.  Precedent has overtaken some of the debates in the case.  Our recent decision in *CommonSpirit* largely resolves several of the plaintiffs' claims:  that their employer TriHealth should not have offered its employees the option of investing their retirement money in actively managed funds, that the performance of several funds was deficient at certain points, and that the overall fees charged for the investment options were too high.  But the complaint contains one other claim not covered by *CommonSpirit*.  The gist of it is this:  Even if a prudent investor might make available a wide range of valid investment decisions in a given year, only an imprudent financier would offer a more expensive share when he could offer a functionally identical share for less.  The plaintiffs claim that TriHealth offered them more expensive mutual fund shares when shares with the same investment strategy, the same management team, and the same investments were available to their retirement plan at lower costs.  Because the plaintiffs in this last respect have stated a plausible claim that TriHealth acted imprudently, we affirm in part and reverse in part the district court's dismissal of their complaint for failure to state a claim.

I.

Defined-contribution plans allow employees to save for retirement, often through a tax-advantaged account like a 401(k) plan, sometimes with matching contributions from their employers.  John Downes & Jordan Elliot Goodman, *Barron's Dictionary of Finance and Investment Terms* 168 (6th ed. 2003).  Employees choose how to invest their accounts from a menu of investment options offered by the plans.  *Id.*  The initial contributions and any growth or

decline over time (minus fees charged) determine the eventual post-retirement payouts from these accounts—along with any interest and dividends generated by the investments. *Id.*

Defined-contribution plans generally give employees a range of investment options. Some may involve actively managed funds, in which the professionals try to maximize returns in a variety of ways. Among them: buying and selling shares in companies based on predictions about future performance; identifying companies with long-term value; and hedging risk by determining the right balance of equities, bonds, and cash in the portfolio. At any given time, there can be bullish actively managed funds and bearish actively managed funds. In recent decades, another option has become prevalent for employee investors: passively managed funds. These funds simply track the stocks in, say, the S&P 500 or some other stock or bond index. "Little surprise, actively managed funds, which require considerable judgment and expertise, charge more than passively managed funds, which require little judgment and expertise." *Smith v. CommonSpirit Health*, No. 21-5964, 2022 WL 2207557, at *1 (6th Cir. June 21, 2022). TriHealth offered both types of options to its employees.

Retirement plans often allow individual employees to access investment options available only to large institutional investors. *See* Karen Wallace, *How to Access Funds with High Minimum Investments*, Morningstar (Aug. 30, 2017), https://www.morningstar.com/articles/823640/how-to-access-funds-with-high-minimum-investments. Mutual fund providers frequently offer different classes of shares. The classes have distinct minimum investment amounts and a range of expenses, the latter often based on a percentage fee of, say .05% or 50 basis points, that each fund charges for managing the investment. *Id.* "Retail" share classes are readily accessible to individual investors. "Institutional" share classes, by contrast, often have a high minimum-balance requirement of $100,000 or more. For those eligible for institutional shares, the providers will waive commissions for selling shares and charge a lower expense ratio. *Id.* All share classes of a fund typically employ the same investment strategy, portfolio, and management team. *Id.*

Institutional share classes typically cost less. Wholesale discounts permit the funds to charge a lower expense ratio when the total investment—say tens of millions of dollars—will be greater. Large institutional investors also cover many of the administrative expenses that the

No. 21-3977      *Forman, et al. v. TriHealth, Inc., et al.*      Page 4

mutual fund would have to pay for retail shares aimed at individual investors, such as marketing and recordkeeping fees. See Galla Salganik, *The 'Smart Money' Effect: Retail versus Institutional Mutual Funds*, 3 J. Behav. Fin. & Econ. 21, 28 (2013). The institutional share class as a result "[i]nvariably" offers "the lowest expenses in the mutual fund universe." Morningstar Rsch. Servs., *Descriptions of Share Class Types*, https://morningstardirect.morningstar.com/clientcomm/Share_Class_Types.pdf (last visited July 11, 2022).

Headquartered in Ohio, TriHealth provides healthcare in a range of settings. Danielle Forman, Nichole Georg, and Cindy Haney have participated in TriHealth's 401(k) plan since at least 2013. The company appointed a Retirement Committee to manage its 401(k) plan. As of 2017, the plan served more than 12,000 participants and managed $457 million in assets. It offered 26 different investment choices.

The three employees sued TriHealth and the plan's administrative committee under ERISA, invoking its remedial provision for breach of a fiduciary duty. 29 U.S.C. § 1132(a)(2). Seeking to represent a class of similarly situated employees covered by the plan, they claim that TriHealth breached its duty of prudence and acted disloyally by failing to monitor the plan's investments. They allege that eight investment options offered by the fund charged higher fees than "available alternatives in the same investment style." R.15 at 14. They claim that the subpar selection of investment options led to administrative fees that were too high for the plan as a whole. And for seventeen of the offered mutual funds, they claim that the plan failed to offer cheaper institutional shares instead of more expensive retail shares. The claimants contend that "holders of different share classes held the same investments and were subject to the same restrictions concerning deposits and withdrawals." *Id.* at 11.

TriHealth moved to dismiss the complaint. See Fed. R. Civ. P. 12(b)(6). The district court granted the motion, concluding that the three employees failed to allege facts from which a factfinder could plausibly infer that TriHealth acted imprudently. R.42 at 1.

## II.

### A.

ERISA protects participants in employee benefit plans, including retirement plans, by establishing standards of conduct for plan fiduciaries. 29 U.S.C. § 1001(b). A fiduciary must fulfill his or her duty "with the care, skill, prudence, and diligence" that a professional "acting in a like capacity and familiar with such matters" would use. *Id.* § 1104(a)(1)(B). Derived from the law of trusts, the duty of prudence requires plan administrators to select initial investment options with care, to monitor plan investments, and to remove imprudent ones. *Tibble v. Edison Int'l*, 575 U.S. 523, 528–29 (2015). The focus is on each administrator's real-time decision-making process, not on whether any one investment performed well in hindsight. *Pfeil v. State St. Bank & Tr. Co.*, 806 F.3d 377, 384–85 (6th Cir. 2015). When judging a trustee's prudence, we look to "the circumstances as they reasonably appear to him at the time when he does the act and not at some subsequent time when his conduct is called in question." Restatement (Second) of Trusts § 174 cmt. b (Am. L. Inst. 1959).

In assessing the prudence of a plan administrator's decision-making process, context often is destiny. The various "circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022). A "careful, context-sensitive scrutiny of a complaint's allegations" provides "one important mechanism for weeding out meritless claims." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).

Civil Rules 8 and 12 frame the inquiry. To test the heft of the employees' complaint, we start with Civil Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). If "we can 'draw the reasonable inference that the defendant is liable for the misconduct alleged'" in the complaint, the claim should "survive a motion to dismiss" under Civil Rule 12(b)(6). *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 281 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The claimant must plead "enough facts to state a claim to relief that is plausible on its face," facts that

No. 21-3977                  *Forman, et al. v. TriHealth, Inc., et al.*                  Page 6

move her "claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Plausibility requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement to relief." *Fabian*, 628 F.3d at 280 (quoting *Iqbal*, 556 U.S. at 678).

A recent decision fills in more of the canvas. In *CommonSpirit*, plaintiffs brought an ERISA imprudence claim alleging a failure to reduce costs and remove overpriced and underperforming funds. 2022 WL 2207557, at *3–7. To support their claims, they highlighted alternative investment options with cheaper prices and allegedly better performance than those currently available for plan participants. But we deemed the allegations insufficient to state a claim. As for the allegedly overpriced features of the plan compared to others, we held, the plaintiffs offered nothing plausibly imprudent about the fiduciary's process. *Id.* at *3–4. The price distinctions reflected reasonable alternative services and strategies for different investors, say for those with a preference for active over passive fund management. "Offering actively managed funds in addition to passively managed funds," we said, "was merely a reasonable response to customer behavior"—and the wide variety of investment goals of a large group of employees with different ages, different risk profiles, and different existing wealth. *Id.* at *3. So too with the performance-based disparities. Although ERISA "does not allow fiduciaries merely to offer a broad range of options and call it a day," a showing of imprudence cannot "come down to simply pointing to a fund with better performance." *Id.* at *4.

These principles demonstrate the importance of a sound basis for comparison in imprudence claims. Disappointing performance in the near term and higher costs do not by themselves show "deficient decision-making, especially when we account for competing explanations and other common sense aspects of long-term investments." *Id.* at *5 (quotation omitted). Different services, investment strategies, and investor preferences invariably lead to a spectrum of options—and in turn a spectrum of reasonable fee structures and performance outcomes. As a result, side-by-side comparisons "of how two funds performed in a narrow window of time, with no consideration of their distinct objectives, will not tell a fiduciary which is the more prudent long-term investment option." *Id.* Even comparator investments that are

"sponsored by the same company, managed by the same team, and use a similar allocation of investment types" will be inapt when "each fund has distinct goals and distinct strategies." *Id.*

B.

How do the three employees' various claims measure up to these requirements?

*Overall plan fees*. The employees claim that TriHealth's average plan expenses were almost twice as high as other comparator plans they identified. But this overall attack on the plan's expense ratio falters due to pleading failures. One problem is that the employees never alleged that these fees were high in relation to the services that the plan provided. *CommonSpirit*, 2022 WL 2207557, at *6–7; *see Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (per curiam). Allowing such bare allegations to proceed, devoid of all context for the services provided, would effectively create liability whenever a plan chooses actively managed funds over passively managed ones—an approach that *CommonSpirit* rejected. The other problem is that the employees never alleged that the fees could not be justified by the plan's strategic goals relative to their selected comparators. A plan fiduciary might prudently seek value in actively managed funds—whether aggressively bullish or highly defensive—that might charge higher expense ratios due to the requisite skills of their management teams. *CommonSpirit*, 2022 WL 2207557, at *4–5. Or a plan fiduciary might make available an actively managed—and thus more expensive—fund that considered non-financial ESG (Environmental, Social, Governance) objectives. On these pleadings, the district court correctly dismissed the employees' claims about the imprudence of the plan expense ratios as a whole.

*Costs and performance of other investments*. For eight of the funds TriHealth offered, the three employees identify "available alternatives in the same investment style" that charged lower fees and performed better over a three-year period. R.15 at 14. But they do not plausibly plead that these available alternatives were otherwise equivalent to the selected funds. *CommonSpirit* rejected the same type of claim. Plan administrators, we explained, have considerable discretion in choosing their offerings and do not have to pick the lowest-cost fund of a certain type where the long-run performance of another fund had the reasonable prospect of

surpassing it.  *CommonSpirit*, 2022 WL 2207557, at *5.  The three employees' allegations do not create an inference of improper process for selecting these funds even if cheaper funds appeared in the market.  *See PBGC ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013) (explaining that to allege a breach of prudence claim, it is not "sufficient to show that better investment opportunities were available at the time of the relevant decisions").

*Breach of duty of loyalty*.  The three employees claim that the plan violated the duty of loyalty by choosing investments that would unduly profit third-party investment managers.  This claim fails because the three employees do not make any allegations suggesting that "the fiduciary's operative motive was to further its own interests," as required to show a breach of the fiduciary duty of loyalty.  *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 40 (1st Cir. 2018) (quotation omitted).

*Different share classes available*.  The three employees separately complain that TriHealth violated the duty of prudence by offering them pricier retail shares of mutual funds when those same investment management companies offered less expensive institutional shares of the same funds to other retirement plans.  Why, they complain, didn't TriHealth take advantage of—indeed just ask for—these lower-priced mutual fund shares for the same investment team and same investment strategy when this retirement plan has nearly half a billion dollars in assets?  This failure to take advantage of the cheaper share classes in 17 of the 26 offered funds, they say, materially decreased the value of their retirement savings.  Taken in their most flattering light, these allegations permit the reasonable inference that TriHealth failed to exploit the advantages of being a large retirement plan that could use scale to provide substantial benefits to its participants.  Under the common law of trusts, which supplied the backdrop to ERISA when Congress enacted it in 1974, *see Tibble*, 575 U.S. at 528–29, that would state a claim of imprudence.

Equally reasonable inferences in the other direction, we appreciate, could exonerate TriHealth once all of the facts come in.  Perhaps the fund is not large enough or does not have enough participants interested in a particular investment to qualify for the less expensive share class.  Perhaps the plan has revenue-sharing arrangements in place that make the retail shares

No. 21-3977 *Forman, et al. v. TriHealth, Inc., et al.* Page 9

less expensive or that benefit plan participants on the whole. But at the pleading stage, it is too early to make these judgment calls. "In the absence of further development of the facts, we have no basis for crediting one set of reasonable inferences over the other. Because either assessment is plausible, the Rules of Civil Procedure entitle [the three employees] to pursue [their imprudence] claim (at least with respect to this theory) to the next stage." *Fabian*, 628 F.3d at 281.

Other courts of appeals have reached similar conclusions at this juncture and in this setting. The Eighth Circuit concluded that comparable allegations gave rise to two plausible inferences of mismanagement. One possibility is that the plan did not negotiate aggressively enough to gain access to the institutional shares. The other was that "it was asleep at the wheel [and] it failed to pay close enough attention to available lower-cost alternatives." *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020). "Either way, a failure of effort [or] competence is enough to state a claim for breach of the duty of prudence." *Id.* (quotation omitted). The Second Circuit likewise concluded that plan participants adequately pleaded imprudence when they "alleged that a superior alternative investment was readily apparent such that an adequate investigation—simply reviewing the prospectus of the fund under consideration—would have uncovered that alternative." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 108 (2d Cir. 2021) (quotation omitted). So too of the Third and Ninth Circuits. *Sweda v. Univ. of Pa.*, 923 F.3d 320, 331–32 (3d Cir. 2019) (holding allegations that plan "selected and retained identically managed but higher cost retail class shares" supplied "substantial circumstantial evidence" from which the court could infer a breach of the duty of prudence); *Kong v. Trader Joe's Co.*, No. 20-56415, 2022 WL 1125667, at *1 (9th Cir. Apr. 15, 2022) (allowing allegation of imprudence to proceed where plan "failed to monitor and control the offering of a number of mutual funds in the form of 'retail' share classes that carried higher fees than those charged by otherwise identical 'institutional' share classes of the same investments").

TriHealth and its amicus offer several objections to this conclusion.

TriHealth, first of all, argues that the three employees needed to "provide a sound basis for comparison—a meaningful benchmark"—to state a claim, namely more specific allegations about the characteristics of the lower-cost share classes with comparisons to the performance of

No. 21-3977 *Forman, et al. v. TriHealth, Inc., et al.* Page 10

the more expensive share classes and to the market as a whole. Appellees' Br. 34 (quotation omitted). Important though the "meaningful benchmark" hurdle may be, it is at its most salient when a beneficiary challenges an investment choice in a vacuum. The plaintiff in that setting must do the work of showing that the comparator investment has sufficient parallels to prove a breach of fiduciary duty. *CommonSpirit*, 2022 WL 2207557, at *5. But if the plaintiff, as in this case, alleges that the fiduciary should have chosen a less expensive share class (with the same investment strategy, portfolio, and management team), the meaningful benchmark comes with the claim. Different ERISA claims have different requirements, to be sure. But this claim has a comparator embedded in it. *Cf. Davis*, 960 F.3d at 483–84 (applying the meaningful benchmark test to a claim about an allegedly underperforming mutual fund but not to claims about the choice of retail over institutional shares of the same fund).

TriHealth's defense of the fund's alleged underperformance falls short for a related reason. Unlike a claim premised on an imprudent choice between two different mutual funds that perform differently over time, a claim premised on the selection of a more expensive class of the same fund *guarantees* worse returns. The two share classes will produce the same initial returns, but higher costs will erode the retail shares' gains and steepen any losses. As costs compound, the differential will grow each year. Over the long haul, management fees, like taxes and inflation, are salient features of investment performance. *CommonSpirit*, 2022 WL 2207557, at *2.

TriHealth, second of all, points to a pair of Seventh Circuit decisions that allegedly rejected this type of claim. *See Loomis v. Exelon Corp.*, 658 F.3d 667, 670–72 (7th Cir. 2011); *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009). But the cases differ factually, and portions of their holdings no longer remain good law.

Start with the facts. The *Loomis* plaintiffs argued that their plan should not have offered any retail mutual funds and instead should have focused on trusts and pools of investments that do not have a retail analog because *only* institutional investors could obtain them. 658 F.3d at 670. The court concluded that this type of trust or investment pool carried a number of disadvantages that the plan could prudently consider. One was that the absence of a retail share class hinders investors' ability to evaluate the funds' performances relative to the open market.

Another was that the expense ratios on the investments were much higher than retail mutual funds on average (1.09% compared to 0.76%). Still another was that the investments were less liquid than mutual funds, as they prohibited daily transfers or simple withdrawals. *Id.* at 671–72. *Hecker* involved plans that may have provided special services, such as "extra investment advice," as part of the retail funds. 569 F.3d 708, 711 (7th Cir. 2009) (order denying rehearing). Today's allegations by TriHealth's three employees distance them from these settings. They claim that the retail and institutional shares of these mutual funds were the exact same except for costs, that the institutional funds were all less expensive than their retail counterparts, and that they "were subject to the same restrictions concerning deposits and withdrawals." R.15 at 11.

Intervening precedent also undermines the force of these two decisions. In *Hughes v. Northwestern University*, the Supreme Court rejected a bright line rule, derived from *Hecker* and *Loomis*, that a broad menu of funds could itself defeat an imprudence claim premised on one particular offering that performed poorly or had high fees. 142 S. Ct. at 742. The Seventh Circuit had held that the plan sponsor "offered participants a menu that includes high-expense, high-risk, and potentially high-return funds, together with low-expense, low-risk, modest-return bond funds. It has left choice to the people who have the most interest in the outcome, and it cannot be faulted for doing this." *Divane v. Nw. Univ.*, 953 F.3d 980, 989 (7th Cir. 2020) (quoting *Loomis*, 658 F.3d at 673–74), *vacated and remanded sub nom. Hughes*, 142 S. Ct. 737. The court then applied that holding to the case before it: "The same logic applies here and leads us to again conclude that it would be beyond the court's role to seize ERISA for the purpose of guaranteeing individual litigants their own preferred investment options." *Id.* Instead, the Seventh Circuit reasoned, "plans may generally offer a wide range of investment options and fees without breaching any fiduciary duty." *Id.* at 992 (citing *Hecker*, 556 F.3d at 586; *Loomis*, 658 F.3d at 673–74). *Hecker* and *Loomis* dismissed imprudence claims in part because the retirement plan under review offered a range of options, including some that were less expensive than the challenged retail mutual fund shares. *Hughes* rejected that bright-line rule, precluding us from evaluating these employees' claims under it.

TriHealth's amicus, third of all, offers an alternative explanation for TriHealth's choice to offer retail shares: revenue sharing. Revenue sharing is one way that retirement plans cover the

No. 21-3977 *Forman, et al. v. TriHealth, Inc., et al.* Page 12

costs of plan administration. Mutual funds pay back a portion of the fees that they charge investors in the plan because the plan or a third party handles recordkeeping and administration services that the mutual fund would otherwise cover. *See Sacerdote*, 9 F.4th at 123–24 (Menashi, J., dissenting in part). Revenue sharing is generally charged as a proportion of fund assets and can serve as an alternative to a flat recordkeeping fee charged to plan participants for administrative costs. *Id.* The idea is that a prudent plan might offer retail share classes to receive revenue sharing payments that institutional shares would not provide. That in turn would justify the increased expense ratio of retail shares because it covers recordkeeping costs that participants would otherwise have to pay separately, and in some cases plans could even pass along part of these revenue sharing payments back to participants as a rebate.

One problem with this argument is that it comes from an amicus, not from a party. TriHealth itself has not offered this alternative explanation for its behavior. But even if we indulged this explanation, it would not change the outcome at this stage. The theory merely provides a competing inference for why TriHealth offered retail-class funds. Revenue sharing remains "one plausible inference, but it is not the only one." *Davis*, 960 F.3d at 483.

This wait-and-see approach also makes sense given that discovery holds the promise of sharpening this process-based inquiry. Maybe TriHealth "investigated its alternatives and made a considered decision to offer retail shares rather than institutional shares" because "the excess cost of the retail shares paid for the recordkeeping fees under [TriHealth's] revenue-sharing model." *Sacerdote*, 9 F.4th at 124 (Menashi, J., dissenting in part). Or maybe these considerations never entered the decision-making process. In the absence of discovery or some other explanation that would make an inference of imprudence implausible, we cannot dismiss the case on this ground. Nor is this an area in which the runaway costs of discovery necessarily cloud the picture. An attentive district court judge ought to be able to keep discovery within reasonable bounds given that the inquiry is narrow and ought to be readily answerable.

TriHealth, last of all, counters that even if we accept this type of share-class claim in the abstract, that does not mean that the three employees plausibly pleaded it here. Volume-based discounts, as with all investment options, come in many shapes and sizes. And ever-larger institutional investors will always gain ever-larger leverage in the market, opening a range of

No. 21-3977 *Forman, et al. v. TriHealth, Inc., et al.* Page 13

favorable opportunities only for those investors. As such, mere allegations that a retirement plan chose retail over institutional share classes—or failed to utilize other volume-based discounts—does not provide a universal golden ticket past a motion to dismiss. The inquiry is as always "context-sensitive," *Fifth Third Bancorp*, 573 U.S. at 425, and the facts of another complaint might suggest an alternative explanation that renders implausible an inference of imprudence.

But the three employees plausibly alleged this claim. They noted that TriHealth's plan has nearly half a billion dollars in assets. They put together a chart showing that the issuers of seventeen of TriHealth's mutual funds "offered different share classes that charged lower fees" to other clients. R.15 at 11. "The holders of different share classes," they alleged, "held the same investments, and were subject to the same restrictions concerning deposits and withdrawals." *Id.* "The only difference between share classes," they alleged, "was that the lower-cost share classes were available only to Plans that had larger investments—but in all cases, TriHealth's Plan . . . was large enough to qualify for the lower cost share class." *Id.* at 11–12. One issuer, for example, allegedly offered cheaper institutional shares for which TriHealth readily qualified. On these pleadings, the three employees have plausibly alleged that TriHealth imprudently failed to offer these discounted shares. This claim may proceed.

We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 21-3977

DANIELLE FORMAN, NICHOLE GEORG, and CINDY HANEY, individually and as representatives of a Class of Participants and Beneficiaries on behalf of TriHealth Inc. Retirement Plan,

    Plaintiffs - Appellants,

v.

TRIHEALTH, INC. and TRIHEALTH 401(k) RETIREMENT SAVINGS PLAN RETIREMENT COMMITTEE,

    Defendants - Appellees.

**FILED**
Jul 13, 2022
DEBORAH S. HUNT, Clerk

Before: SUTTON, Chief Judge; KETHLEDGE and READLER, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED IN PART, REVERSED IN PART, and REMANDED for further proceedings consistent with the opinion of this court.

                              **ENTERED BY ORDER OF THE COURT**

                              Deborah S. Hunt, Clerk